IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**JAMES ALAN ROSS #321-218**
    **Petitioner**                 :

    **v.**                     :      **CIVIL ACTION NO. JKB-11-1672**

**WARDEN JOHN S. WOLFE, *et al.*,**    :
    **Respondents**

## MEMORANDUM

James Alan Ross *pro se* filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 17, 2011, challenging his convictions in the Circuit Court of Charles County, Maryland. ECF No. 1. Respondents have responded (ECF No. 9), and Ross has filed a reply as supplemented (ECF Nos. 11 and 15) and a request for evidentiary hearing (ECF No. 16). Ross has also filed a motion for appointment of counsel. (ECF No. 17.) After reviewing these papers, the court shall deny the request for evidentiary hearing and deny the petition as to the claim of breached plea agreement. As to the two remaining claims—ineffective assistance of counsel and voluntariness of the plea—the Court concludes the interests of justice require appointment of counsel under 18 U.S.C. § 3006A(a)(2)(B) and 28 U.S.C. § 2254(h). Appointed counsel shall be provided a copy of this memorandum and accompanying order and shall, within 60 days hereof, submit a brief addressing these two issues:

1. Ineffective assistance of counsel during plea negotiations (but only regarding the issue of counsel's materially misleading his client about the state's attorney's expectation as to the likely sentence and its execution) and whether that prejudiced Ross; no other issue on ineffectiveness shall be briefed as the Court finds only this one contention to be viable.

2. Involuntariness of the plea due to Ross's reliance upon his counsel's misleading advice.

### Procedural History and Background

Ross was charged with five counts of attempted first-degree murder, five counts of first-degree assault, five counts of second-degree assault, and one weapons offense. ECF No. 9,

Exhibit 1.  On April 7, 2004, Ross appeared before the Honorable Amy J. Bragunier to enter an *Alford*[1] plea to four counts of first-degree assault.[2]  *Id.*, Exhibit 2 at 2-5.  The plea agreement, memorialized in a written document signed that day by Ross, defense counsel, the assistant state's attorney, and the judge, provided that in exchange for the plea, the court agreed to "recommend defendant be based at the Patuxent Institution.  Otherwise the Court has full discretion."  *Id.*, Exhibit 3.  During the plea colloquy, the judge also indicated that at "sentencing the Court would have [sentencing] discretion except that the recommendation and [sic] I will agree to bind myself that I will recommend that the defendant, Mr. Ross, be housed at the Patuxent Institute."  *Id.*, Exhibit 2 at 5-6.  Upon judicial inquiry, Ross acknowledged that he had reviewed the charges and discussed the case with his attorney, Richard Gummere.  *Id.* at 7, 13.  Ross affirmed that he understood that each of the four offenses to which he was entering a plea carried a maximum sentence of 25 years in prison and that the court could order each sentence to be served consecutive to the other, which made the total possible sentence in his case 100 years in prison.  *Id.* at 7-8.  Ross also acknowledged that, as a result of entering a plea, he would give up his right to contest the charges on grounds such as self-defense, voluntary intoxication, or insanity.  *Id.* at 11-12.  Ross confirmed on the record that he was satisfied with trial counsel's performance.  *Id.* at 14.  Ross acknowledged a second time that, pursuant to the terms of the plea agreement, he could be sentenced to serve "100 years in jail."  *Id.*  When the court advised Ross that he could have a trial if he wanted one, Ross declined, stating: "I think this will be the more simpler [sic] for everybody involved.  Everybody suffered enough in this, including myself."  *Id.* at 15.

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

[2] The remaining twelve counts against Ross were *nolle prossed*.  *Id.*, Exhibit 2 at 13.

Following the plea colloquy, the State recited into the record the facts supporting the

plea:

> Your Honor, had this matter been a trial the general gist of what the evidence would be is that back on May 14th, 2003, the defendant before you today, Mr. Ross, went to the Holly Lane area of Charles County, Maryland of Waldorf in Charles County, Maryland.
>
> He went there with a man named Gorham Levi and they went to go visit a man named Timmy Deboard, who lived at 11685 Holly Lane at the time and they asked Mr. Deboard if he wanted to go fishing with them.  There was conversation between Mr. Ross and Mr. Deboard and the conversation turned into an argument.
>
> I know accounts differ as to exactly what happened between Mr. Ross and Mr. Deboard.   Mr. Deboard's report is that Mr. Ross, the defendant, during the argument pulled out a knife and swung at him.   Mr. Ross' account of what happened is different.  Larry Matthews attempted to intervene and he was cut by the defendant.
>
> Again, Mr. Ross' account would be different than Mr. Matthews.  Mr. Matthews would say that the defendant approached him with a knife and cut him. Ultimately Mr. Matthews was cut.
>
> Court's indulgence.
>
> Mr. Matthews ended up with a lacerated liver and was also stabbed in his face.
>
> The defendant left the residence of 11685 Holly Lane and some people were across the street a Ms. Frances Ford, who lives in the neighborhood, as well as George Williams, his wife, Mable, and their grandchildren, across from Holly Lane and they would testify that they heard a commotion across the way. They see the defendant come out of the house and the defendant comes out  and tears off his shirt appears to have what appear[s] to be a knife in his hand.  He starts screaming things like I am going to kill you, you are going to see me on the news and other words to that effect.
>
> And somebody else made a report that he was God or made some reference to God.  In any event, he charges up to them and as they try to flee and try to get inside the defendant ends up striking Mr. Williams first, strikes him in the chin with a knife, the blade penetrates the base of Mr. Williams' chin and then strikes him in the right eye with the knife.
>
> Ms. Frances Ford turns to flee and he stabbed her at first in the back while she is at one point down on the ground he then strikes her with a stick object, either a bamboo rod or some other stick that was in the ground and also with a flower pot.

Ironically enough Ms. Ford has lost hearing in that ear she said as a result of the attack from the object.  It is ironic because Mr. Ross is talking about his loss of hearing.

There was also Sammy Lewis who was present at the time he was stabbed in the upper right arm by the defendant.  Mr. Lewis suffers from Alzheimers and has no present recollection of what occurred although other people did see him attack Mr. Lewis.

All of the witness[es] who saw that would say that they, no actions certainly by Ms. Ford, Mr. Williams and Mr. Lewis were in any way that they had any acts directed at Mr. Ross, they didn't threaten him, they didn't have any weapons in their hand[s] and Mr. Ross in fact attacked them.

The police were called and in fact Sergeant Ondrish arrives in time to see Mr. Ross standing over Ms. Ford, beat her with a flower pot.  He tries to get him to come off her, the defendant has a knife and turned the knife and ultimately several officers respond and the defendant fights with the officers, engaged in offensive contact with one of the officers as he is trying to get him in the police car.

Detectives respond, officers respond, crime scene responds and the knife is recovered that he used and they recovered the knife that was used.

They recover other items [of] clothing and the State would have submitted medical reports showing the injuries from the people as well as testimony from the witnesses and for purposes of the plea that is some of the evidence that we would have presented.

*Id.* at 18-22.  The court found that the facts supported the plea as to four counts of first-degree assault, found Ross's plea to be entered knowingly and voluntarily, and accepted the plea.  *Id.* at 23-24, 26.

At his June 8, 2004, sentencing hearing, Ross explained that the violent episode was fueled by a history of drug use, including PCP that he had smoked earlier that day.  *Id.*, Exhibit 4 at 15-20.  The court was not sympathetic.  Ross was sentenced to an aggregate of 70 years' imprisonment and his postjudgment and appellate rights were explained to him on the record. *Id.*, Exhibit 4 at 22-24.  Despite judicial recommendation, he was not accepted for treatment at Patuxent Institution and is serving his sentence within Maryland's Division of Correction.  On

June 10 and June 28, 2004, Ross filed motions for reconsideration of sentence that were not ruled upon by the court. *Id.*, Exhibit 1. On June 29, 2004, Ross filed an application for review of sentence by a three-judge panel that was denied on September 30, 2004. *Id.* On July 1, 2004, Ross filed an application for leave to appeal the entry of his plea, which, as supplemented, questioned (1) whether the trial court erred in accepting his guilty plea where the record shows that a competency evaluation was not done, (2) whether the trial court erred in accepting the guilty plea before determining that the plea was entered with a knowledge of the nature of the offenses, and (3) whether the trial court erred in sentencing Ross on a count that was not part of the plea. *Id.*, Exhibits 5-6. On December 20, 2005, the Court of Special Appeals of Maryland in an unreported opinion remanded the case to the circuit court for correction of the docket entries and commitment record. *Id.*, Exhibit 7. Upon reconsideration, the intermediate appellate court recalled its opinion and, on March 5, 2008, issued an unreported opinion granting the same relief as the earlier opinion and denying the remaining claims.[3] *Id.*, Exhibits 8-9.

On November 17, 2008, Ross filed a petition for state postconviction relief in the Circuit Court for Charles County. In his petition as supplemented, Ross alleged that (A) the trial court erred in accepting the guilty plea (1) without conducting a competency evaluation and (2) without determining that Ross understood the nature of the offenses; (B) the State breached the plea agreement by recommending a 100-year sentence; and (C) trial counsel was ineffective based on (1) a conflict of interest, (2) failure to obtain an evaluation of Ross's mental health at the time of the assaults, (3) advice to Ross that he would serve only ten years in prison,

---

[3] Respondents indicate the court's mandate issued on April 7, 2008. Ross did not seek further review in the United States Supreme Court, *see* Paper No. 1 at 3. Thus, his judgment became final for direct review purposes on Monday, July 7, 2008, when the time for doing so expired.

(4) failure to object to improper prosecutorial allocution, and (5) failure to assure that Ross's plea was entered knowingly and voluntarily. *Id.*, Exhibits 10-13.

At the postconviction hearing, testimony was given by Ross, Ross's sister, Ross's son, the trial prosecutor, and trial defense counsel.[4] *Id.*, Exhibit 12. In a memorandum opinion and order filed on May 28, 2009, the Circuit Court denied post-conviction relief. *Id.*, Exhibit 13. In his application for leave to appeal the postconviction court's decision, Ross alleged that (A) the postconviction court improperly denied his motion to withdraw his petition; (B) the state breached the plea agreement by recommending a 100-year sentence; (C) trial counsel was ineffective for advising Ross that he would only serve ten years in prison; and (D) Ross's guilty plea was not knowing and voluntary. *Id.*, Exhibit 14. The application for leave to appeal was summarily denied by the Court of Special Appeals of Maryland in an unreported opinion filed on August 19, 2010.[5]

In his § 2254 petition, Ross challenges his plea and sentences on three separate grounds: (1) the state breached the plea agreement by recommending a 100-year sentence; (2) trial counsel was ineffective for advising Ross that he would serve only ten years in prison if he pled guilty; and (3) the guilty plea was not knowing and voluntary.

---

[4] Ross requests an evidentiary hearing to provide testimony from his mother, Ms. Mary A. Howland. The court notes that Ross submitted an April 3, 2004, letter from his mother as Exhibit 3, appended to his petition (ECF No. 1 at 35). The letter supports the testimony presented at postconviction by Ross, his sister, and his son that counsel told family members that a plea agreement would result in a sentence of less than ten years, a portion of which would be served at Patuxent. Ms. Howland indicates that counsel told her that Ross could receive a forty-year sentence. She also indicated that counsel had interviewed one prosecution witness, the "elderly woman," who cried, and that "if you went to trial and they put her on the witness stand, it wouldn't help." The letter includes advice that "[i]f you choose to go with him [defense counsel] I would try to pin him down to the exact number." *Id.* Ms. Howland's testimony at best would be cumulative to that already provided in the postconviction hearing. Under Rules 7 and 8 of the Rules Governing Habeas Corpus Cases, there is no apparent need to convene an evidentiary hearing to obtain additional testimony from this witness.

[5] A motion to reconsider was subsequently denied and the intermediate appellate court issued its mandate on January 5, 2011. *Id.*, Exhibit 15.

### Standard for the Writ of Habeas Corpus

The federal habeas statute, 28 U.S.C. § 2254, as amended, provides a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  This "highly deferential" standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S. Ct. 1388, 1398 (2011); *see also Harrington v. Richter*, 562 U.S. __, __, 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be.").  Petitioner carries the burden of proof to meet this standard.  *See Pinholster*, 131 S. Ct. at 1398.

Section 2254 provides:

d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254(d)(1) and (2) (amendments enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA amendments to 28 U.S.C. § 2254 require this Court to limit its analysis to the law as it was "clearly established" by precedent at the time of the state court's decision.[6] *Pinholster*, 131 S. Ct. at 1399.

The "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. *Williams*, 529 U.S. at 413 (O'Connor, J., concurring); *see also Cone,* 535 U.S. at 694. In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (citing *Williams*, 529 U.S. at 407). To be "unreasonable," the state court's application of Supreme Court precedent must have been more than incorrect or erroneous. *See Andrade*, 538 U.S. at 75. The state court's application must have been "objectively unreasonable." *See Williams*, 529 U.S. at 409, *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

That high standard cannot be met by Petitioner with regard to his claim of breach of the plea agreement. However, the remaining two claims merit further discussion.

---

[6] The Supreme Court recently examined whether counsel was ineffective in failing to communicate a prosecutor's written plea offers prior to their expiration, where the defendant subsequently incurred another arrest just before pleading guilty to the original charge without an underlying plea agreement and received a sentence substantially greater than that contemplated in the written plea offer. *See Missouri v. Frye*, ___ U.S. ___, 132 S. Ct. 1399 (March 21, 2012). The *Frye* decision is inapplicable to the facts of this case and in any event would not constitute "clearly established" precedent at the time the state post-conviction decision was rendered.

**Analysis**

**A.  Breach of the Plea Agreement**

Ross first alleges that the state breached the plea agreement by requesting a maximum sentence of 100 years of incarceration.  ECF No. 1 at 16-20.  The state postconviction court found no evidence to support this claim:

> The plea/sentence agreement document, dated April 7, 2004, signed by Jerome Spencer, Richard Gummere, James A. Ross, and Judge Amy Bragunier, states that "Defendant will plead guilty to four counts of first degree assault (Counts 6, 7, 8, 9), pursuant to *Alford v. North Carolina*.  State will dismiss other charges.  Court will recommend defendant be housed at the Patuxent Institute.  Otherwise, the court has full discretion.  There is no other sentencing limitation except that provided by law."  A space allowed on the form for memorializing "other agreement(s)" is left blank.

> Criminal Law Section 3-202(b) authorizes a maximum penalty of 25 years imprisonment for first degree assault.  4 times 25 = 100.  The prosecutor did not violate the agreement just described by making a 100-year sentence recommendation (which, in any event, the Court did not follow).  Moreover, Petitioner specifically acknowledged to Judge Bragunier that he understood that the plea/sentence agreement would permit her to sentence him to 100 years' incarceration.  (Transcript page 7, line 20 ff.)  I have seen no evidence of violation of the agreement.

ECF No. 9, Exhibit 13 at 4.

This ruling of the postconviction court is supported in the record; nothing in the plea agreement signed by the prosecutor limited the state's attorney from recommending a 100-year sentence.  ECF No. 9, Exhibits 2-3.  In fact, the trial judge clearly articulated, and Ross acknowledged, that the maximum sentence pursuant to the terms of the plea agreement was 100 years in prison and the judge reserved full discretion over sentencing but would recommend Ross's placement at Patuxent Institution.  *See id.*  The state's representations at time of sentencing were fully consistent with the terms of the plea agreement.  Exhibit 13 at 4.  Thus, the

denial of postconviction relief on this ground constitutes a reasonable application of the law and will be upheld under 28 U.S.C. § 2254(d).

### B.  Ineffective Assistance of Counsel

The two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs the standard for examining ineffective assistance claims.   First, a petitioner must demonstrate that the performance of his counsel was deficient by falling below an objective standard of reasonableness.  *Id.*  Second, a petitioner must demonstrate that he suffered prejudice as a result of the defective performance.  *Id.*  The *Strickland* standard applies equally to matters resolved by way of plea bargaining; to obtain relief from his guilty plea based on ineffective assistance, Ross must show that (1) counsel was incompetent and that (2) he would not have pleaded guilty but for counsel's incompetence.  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Fields v. Attorney General of Maryland*, 956 F.2d 1290, 1297 (4th Cir. 1992).

The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy."  *Strickland*, 466 U.S. at 689.  Further, in the context of a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly.  Rather, a petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner.  *See Cone*, 535 U.S. at 698-99.

The first prong of the *Strickland* test requires an evaluation of counsel's performance in light of an "objective standard of 'reasonably effective assistance' under 'prevailing professional norms.'"  *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir. 1984).  The American Bar Association's

standards, recognized by the Supreme Court as "guides to determining what is reasonable," *Strickland*, 466 U.S. at 688, provide the following guidelines concerning the proper relationship between defense counsel and client in the plea agreement context:

> (a) Defense counsel should conclude a plea agreement only with the consent of the defendant, and should ensure that the decision whether to enter a plea of guilty or nolo contendere is ultimately made by the defendant.
>
> (b) To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the client of the alternatives available and of considerations deemed important by defense counsel or the defendant in reaching a decision.

*Id.*

Likewise, Rule 1.4 of the Maryland Rules of Professional Conduct requires defense counsel to communicate the terms of all plea offers made.  Federal courts have been unanimous in finding that where defense counsel has failed to inform a defendant of a plea offer, or where defense counsel's incompetence results in a defendant's deciding to go to trial rather than pleading guilty, such conduct constitutes a violation of a defendant's Sixth Amendment right to the effective assistance of counsel.  *See, e.g.*, *Johnson v. Duckworth*, 793 F.2d 898, 900-02 (7th Cir. 1986) (defense counsel should keep defendant apprised of all developments in plea negotiation process and communicate prosecutor's proposals promptly); *United States v. Blaylock*, 20 F.3d 1458, 1465-66 (9th Cir. 1994) (failing to inform defendant of plea offer was unreasonable assistance); *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (failure to advise client to enter plea bargain when it is in client's best interest constitutes ineffective assistance of counsel); *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435, 438 (3d Cir. 1982) (failure to communicate plea bargain offer to defendant denied defendant his Sixth and Fourteenth Amendment rights to effective assistance of counsel).  The Supreme Court recently confirmed that counsel's failure to communicate a plea offer may constitute a Sixth Amendment

violation, but only if the second prong under *Strickland* is met.[7]

The second prong under *Strickland* requires Ross to show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[8]   *Hill*, 474 U.S. at 59.   To be constitutionally valid, a guilty plea must represent a voluntary and intelligent choice among the alternative courses of action open to the defendant. *See Alford*, 400 U.S. at 31.   To apply this standard, the court must look to the totality of the circumstances surrounding the guilty plea.   *See Brady v. United States*, 397 U.S. 742, 749 (1970) (defendant's solemn declaration of guilt presumed truthful in absence of impeaching evidence). The Constitution requires the circumstances to reflect that the defendant was informed of all direct consequences of his plea.   *Brady*, 397 U.S. at 755.   The plea may be considered involuntary if the defendant does not understand the nature of the constitutional rights he is waiving or unintelligent if the defendant does not understand the charges against him.   *See Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1975).

Prior to trial, Ross's attorney drafted two "Memoranda of Understanding" ("MOU") concerning the possible sentence and likely plea position for the charges Ross faced.   The first MOU, unsigned and undated, indicated that Ross faced five charges of attempted murder, each

---

[7] *See Missouri v. Frye, supra.*

[8] Further, where counsel substantially misinforms his client as to the maximum possible sentence, a guilty plea cannot stand.   *See Manley v. United States*, 588 F.2d 79, 81-82 (4th Cir. 1978); *Hammond v. United States*, 528 F.2d 15, 18 (4th Cir. 1975) (citing with approval *Cooks v. United States*, 461 F.2d 530 (5th Cir. 1972), in which Fifth Circuit held, where counsel was ineffective in advising client on maximum length of potential sentence, plea was not voluntary because made without knowledge of factors pertinent to proper determination of whether to plead guilty or not).   Counsel's bad guess as to what a judge may do, however, does not require vacatur of a sentence.   *See United States v. Futeral*, 539 F.2d 329, 330-31 (4th Cir. 1975) ("While Futeral had a strong basis for hope that the court would follow the recommendation, he was not misled in any way").   Ross was properly advised by counsel in the first Memorandum of Understanding and again by the trial court as to the possible maximum sentences for each of the counts to which he entered his plea and informed that the sentences could be imposed consecutively.   ECF No. 9, Exhibit 2 at 7-8.

of which carried "exposure of life in prison."[9]   The MOU noted "[t]he typical disposition for a case like this is consecutive sentences so that even if the sentence were imposed at twenty (20) years per crime, there would be an exposure of one hundred (100) years of actual jail time."   The MOU further noted that Ross also faced charges of first-degree assault, which carried similar penalties,[10] and that Maryland's sentencing "guidelines range anywhere from nine (9) years to twenty (20) years per assault, meaning that the guideline would provide for between forty-five (45) years and one hundred (100) years of incarceration."   The MOU indicated "a tentative agreement with the prosecutor that any plea agreement would involve a mandatory recommendation by the Judge for treatment at the Patuxent Institution" and further noted that Patuxent "would receive Mr. Ross probably three (3) years after his confinement at [the Division of Correction]" and "would hold Mr. Ross until it was felt that he was safe to resume life in the community," which "could be several years."   The document concluded with a statement that "[i]t is likely that Mr. Ross would be free in less than ten (10) years from the date of his original arrest should he be treated at the Patuxent Institute and should the Court recommend it as is the present understanding."   ECF No. 9, Exhibit 10 at Exhibit D.   Nothing in the MOU suggests that Ross would in fact be guaranteed admission to Patuxent.[11]

Under the terms of the second MOU, signed solely by Ross and dated two days prior to

---

[9]   Under Maryland law, attempt to commit murder in the first degree carries a potential life sentence.   Md. Code Ann., Crim. Law § 2-205.   A sentence of up to thirty years may be imposed upon conviction of attempt to commit murder in the second degree.   *Id.*, § 2-206.

[10]   This premise is incorrect; under Maryland law, assault in the first degree carries a sentence not to exceed 25 years' incarceration.   Md. Code Ann., Crim. Law § 3-202.   This miscalculation did not result in actual prejudice to Ross under *Manley*, as Ross pleaded guilty to four counts of first-degree assault and the maximum possible sentence under law was in fact 100 years as contemplated in the MOU.

[11]   The record does not offer clear information on precisely how the Patuxent Institution program works.   The governing statutes do indicate, though, that Patuxent's emphasis is on remediation rather than incarceration and that Patuxent and its Board of Review enjoy some autonomy in terms of accepting inmates, designing program services, and determining when and under what conditions inmates may be released back into society.   Md. Code Ann., Corr. Servs. § 4-401 *et seq.* (LexisNexis 2008).

his plea hearing, Ross (1) agreed to enter an *Alford* plea to four counts of first-degree assault without a "cap" on sentence, based on the belief that a "cap" might be less beneficial than a sentence imposed within the sentencing guidelines; (2) noted an understanding between defense counsel and the state's attorney that the trial judge would make a binding recommendation for treatment at Patuxent; and (3) indicated that Ross would be in prison "for several years" and that based on the Judge's treatment recommendation he would "be dealt with at…Patuxent…[and] transferred under the Department of Corrections to that facility after several years in the penitentiary" where Ross "expect[ed] to [remain] in…Patuxent…for several years."  Finally, the MOU memorialized that Ross's "attorney *and the State's Attorney, according to my attorney, believe that I will be in the Maryland prison system, both Patuxent and conventional prison, for a period of somewhat less than ten years.  Neither [Ross's] attorney nor the State's Attorney nor I have complete knowledge of the way in which my referral to…Patuxent…will be handled.*"  *Id.*, Exhibit 10 at Exhibit E (emphasis added).

At postconviction, trial counsel testified that a "cap" was discussed and not offered by the prosecution, but a "flat out forty years was."  Both counsel and Ross felt this was unreasonable and that reliance on the guidelines might provide a lesser sentence.[12]  *Id.*, Exhibit 12 at 12, 16-18. Counsel admitted that he wrote the final paragraph in the second MOU "based on [his] fair expectations of the kind of sentence [Ross] would eventually serve in terms of active time" and that Ross "was going to get a very favorable sentence by comparison to what he got."  *Id.* at 21. Counsel admitted, however, that by stating that the state's attorney believed that Ross would serve less than ten years, he was "going overboard in trying to tell Mr. Ross what I saw going on" and that the state's attorney "never made an agreement with regard to the ten years.  I was

---

[12]  Despite reference to the guidelines, it appears there was no effort on the part of trial counsel and the state's attorney to influence the trial court to sentence within the guidelines.  *Id.*, Exhibit 12 at 20.

hoping that his understanding of the sentence and his understanding of what would happen to Mr. Ross after he were incarcerated was consistent with that." Counsel also agreed that the MOU "absolutely" might lead Ross to believe he would only serve ten years. *Id.* at 22.

Ross testified that he believed the April 5 MOU that he signed was the actual plea agreement reduced to show four counts of first-degree assault, and that counsel told him "this is how it's going to be and…you should take [it,] Jim." *Id.*, Exhibit 12 at 104-05. Ross also testified that he did not want to admit guilt because he was not "guilty as charged because of the condition of my mind at the time." *Id.* at 105-06. He admitted, however, that "[b]y pleading guilty I thought I was…limiting myself…to the guilty plea agreement that we had" and limiting his exposure to "less time than a hundred years." *Id.* at 107. Ross further testified he believed that despite significant exposure, he would be sentenced to less than ten years and the fact that the state's attorney was referenced in the MOU indicated the state was "on board" with the foreshortened sentence. *Id.* at 108-10. Ross emphatically stated that had he known he would be facing up to 100 years' incarceration, he would "have went [sic] to trial and took my chances because they [the state's attorney and trial judge] hadn't even, I plead guilty, I laid myself in front of these people but they didn't get to hear what really happened to me…" *Id.* at 112.

During the hearing, the postconviction court examined the actual plea agreement signed on April 7, 2004,[13] by the trial judge, Ross, defense counsel, and the state's attorney prior to the plea colloquy. ECF No. 9, Exhibit 12 at 121-22. When questioned, Ross testified that he signed the agreement, which indicated it was the sole agreement among the parties and provided "no other sentencing limitations except as provided by law," because he "honestly thought that was what my lawyer had worked out with the Court for my end results" and because he "was coached

---

[13] A copy of the actual agreement signed by the parties is found at ECF No. 9, Exhibit C, attached to Exhibit 6.

by [trial counsel as to what] to say and do." *Id.*, 122-25.

The postconviction court rejected Ross's claim that counsel misled him into believing he

would receive a maximum sentence of no more than ten years if he entered a plea:

> Petitioner's son James, Jr. testified that Mr. Gummere has assured him that the plea and sentence agreement which had been achieved for his father represented "a pretty good deal." He said that Gummere predicted that in such a scenario Ross, Sr. would likely serve no more than 8 to 10 years and that although he, the son, thought 8 to 10 years was "a lot," he had encouraged his dad to take the deal on Gummere's recommendation.
>
> Petitioner testified that Gummere had urged that he accept the plea arrangement reflected in the memorandum previously described since a trial at which credible witnesses described the incident would render him susceptible to multiple life sentences. Petitioner professed to be unfamiliar with sentencing guidelines but admitted having seen a document drafted by Gummere (Petitioner's April 23 Exhibit 3) speculating that a guideline range from 45 to 100 years might apply to his situation. For reasons not apparent to me at the sentencing event, at the April 23 post-conviction hearing and at Petitioner's post-sentencing discussions with Mr. Gummere and with jailhouse sentencing veterans argument and comment occurred regarding appropriate guidelines calculation, but categorically no evidence has been presented to suggest, much less demonstrate, that Ross' decision to plead as he did was in any way affected by allusion to sentencing guidelines or that the Court was bound in any way to utilize the guidelines, however calculated. Rather, Petitioner's April 23 Exhibit 4, a memorandum of understanding signed by Ross on April 5, 2004, appears to have outlined his motivation for entering the pleas and understanding of the context in which he was acting. The document does make reference to guidelines when discussing Ross' decision not to ask the Court to agree to a limitation on active incarceration, declaring that he anticipates (somehow) "the guidelines" may be "more beneficial" than a preset cap, but neither it nor any other evidence reflects an understanding or an expectation that guidelines would affect the ultimate sentence.
>
> *The April 5 document does confirm Ross' statement that he was led to believe that the plea and sentencing would result in incarceration for something less than 10 years.* It is clear to me from reviewing Petitioner's Exhibits 3 and 4 that the basis for such speculation was the guarantee of a referral to Patuxent and a qualification, set out in Exhibit 3, that "[i]t is likely that Mr. Ross would be free in less than ten (10) years from the date of his original arrest should he be treated at the Patuxent Institute. . . ." In this body of evidence there is no other basis for such speculation but there is this one.

That said, there is nothing to support Petitioner's implication that anyone guaranteed either such a limitation on active incarceration or his acceptance by Patuxent.   In fact the evidence is that all mention of Patuxent was contingent exemplified by use of the terms of "referral," "recommendation," and "should he be treated."

. . .

As discussed above at Item 2, above, the several memoranda and explication with the judge on the record satisfy me that Petitioner fully understood and intelligently and voluntarily entered the pleas or that he lied to the judge.

ECF No. 9, Exhibit 13 at 5-7 (emphasis added).   Based on these factual findings, the postconviction court reached the following conclusion:

Although Ross' hope of acceptance by Patuxent and the attendant, but speculative, spect[e]r of less active incarceration were not realized, the evidence before me fails [to] demonstrate that defense counsel's services were other than at or above the level of competence expected.   James Alan Ross categorically was not deprived of effective assistance of counsel in this case.

ECF No. 9, Exhibit 13 at 7.

Nothing suggests that Ross's counsel failed to communicate that the prosecutor would not agree to a forty-year cap.   The first MOU clearly informed Ross that he faced exposure of up to 100 years' incarceration.   Nor does the record suggest, based on representations in the first MOU, that Ross was unaware that, even at the lowest articulated range of the sentencing guidelines, he likely faced a minimum of nine years' incarceration for each count of first-degree assault.   It is undisputed that trial counsel and the prosecutor had many discussions concerning a potential plea agreement, *see* Paper No. 9, Exhibit 12 at 12, 51, and that both sides agreed the plea would encompass the trial judge's binding recommendation that Ross be evaluated for treatment at Patuxent.   Ross also appears to have no quarrel with the terms of the plea wherein the state agreed to nolle prosse numerous offenses, including five counts of attempted first-

degree murder (each of which carried a possible life sentence), in exchange for Ross's plea to four counts of first-degree assault.

The troubling aspect of this case centers around the second MOU, signed solely by Ross, which stated, without qualification, that both trial counsel and the prosecutor believed that after several years of imprisonment Ross would be admitted to Patuxent based on the trial court's recommendation and, upon completion of treatment, returned to the community within ten years. Trial counsel admits he misled Ross, and that he allowed Ross and Ross's family to believe the prosecutor was on board with a sentence of less than ten years, all based on counsel's "hope" that a Patuxent placement would lead to the desired result. Counsel admits that he went "overboard" in his effort to persuade his client to make what he, counsel, clearly thought was the right choice in the circumstances.

The second MOU's representation as to the state's attorney's expectations was flatly untrue. Moreover, the record shows that Ross, while not misinformed about the *potential, maximum length* of his sentence, did believe his guilty plea would result in less than ten years of incarceration.[14] Indeed, the finding of the postconviction court supports this conclusion. *See* ECF No. 9, Exhibit 13 at 5-7 ("The April 5 document does confirm Ross' statement that he was

---

[14] In *Blackledge v. Allison*, 431 U.S. 63 (1977), a North Carolina prisoner sought habeas corpus relief on the ground that his guilty plea was involuntary because of an unkept plea agreement. The United States District Court for the Middle District of North Carolina summarily denied relief, and petitioner appealed. The United States Court of Appeals for the Fourth Circuit reversed and remanded, 533 F.2d 894, and certiorari was granted. The Supreme Court held that federal courts in administering the writ of habeas corpus and its federal postconviction counterpart cannot fairly adopt a per se rule excluding all possibility that a defendant's representations on the record at time his guilty plea was accepted were the product of such factors as misunderstanding, duress, or misrepresentation by others as to make his guilty plea a constitutionally inadequate basis for imprisonment. Because the state record was undeveloped, the case was remanded for discovery and expansion of the record. The *Blackledge* Court noted, however, that "the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings," *id.* at 73-74, and "[s]olemn declarations in open court carry a strong presumption of verity," *id.* at 74, *quoted in Tovar Mendoza v. Hatch*, 620 F.3d 1261, 1269 (10th Cir. 2010) (evidentiary hearing required where new evidence suggested trial counsel promised defendant the trial judge with whom counsel had a "special relationship" agreed to impose a three-year sentence in exchange for a guilty plea to serious felony charges).

led to believe that the plea and sentencing would result in incarceration for something less than 10 years"). In hindsight, this belief was clearly erroneous because it was premised upon the misrepresentation of counsel. But the focus in this habeas corpus case is not on the ultimate correctness of Ross's belief but on why he had that belief—counsel's misleading statement and thereby ineffective assistance—and whether it affected his decision-making to his prejudice. Ross, who was in his mid-fifties at the time of sentencing, stated that he would have gone to trial and taken his chances trying to garner understanding as to what compelled his actions,[15] rather than be sentenced under a plea agreement that essentially amounts to a life sentence.

Ordinarily, a petitioner is not entitled to habeas relief simply on the basis of his unsupported claim that the plea bargain was misrepresented to him by his attorney, especially where the record fails to corroborate the claim. *See Nichols v. Perini*, 818 F.2d 554, 558-59 (6th Cir. 1987). Here, however, Ross's postconviction testimony accords with that of trial counsel Gummere, who indicated that "as soon as I became aware of the nature of the evidence against [Ross] I became convinced that it was not a try able [sic] case" and that he discussed the need to enter a guilty plea "ever[y] time I met with him, ever[y] time I spoke with him." *Id.* at 11. Gummere also had frequent ongoing discussions of a possible plea agreement with the prosecutor, whose best offer was a forty-year sentence rejected by both Gummere and his client. *Id.* at 12-13. Counsel testified that he believed "the guidelines would probably max out around forty years" and that the guidelines document prepared by the Probation Department indicated the range of eighteen to thirty years, well within the forty-year fixed sentence proposed by the prosecution. *Id.* at 17-18. Counsel also wanted his client to understand that he would initially be incarcerated in a Division of Correction prison but would then be transferred to Patuxent to

---

[15] The court notes that this incident was not the first triggered by Ross's voluntary use of PCP. *See* ECF No. 9, Exhibit 4 at 3-4.

spend several years undergoing rehabilitative programming, *id.* at 20-21, yet counsel himself did not know—and did not explore—the process and parameters used to determine Patuxent eligibility.  *Id.* at 27, 33.  Furthermore, by his own admission, counsel at sentencing did not object to the prosecutor's correction of the guidelines prepared by the Probation Department, even when the correction increased the sentencing range to a maximum of ninety years.  *Id.* at 24.

The finding of the postconviction court that Ross was misled by counsel about an obviously material matter is irreconcilable with its conclusion that Ross had effective assistance of counsel.  Under no prevailing norm of professional conduct of which this court is aware is defense counsel permitted to make an intentional misrepresentation to his client about the prosecutor's expectation of a likely sentence in order to induce his client's guilty plea. Notwithstanding the findings of the postconviction court, the record leads this court to the conclusion that counsel's performance fell below an objective standard of reasonableness.[16] Were this court reviewing the actions of defense counsel in the context of a motion to vacate a federal plea and sentence, the undersigned would find counsel's representation deficient based on an outright misrepresentation that led Ross to reasonably rely on the MOUs drafted by his attorney (neither of which was based on a concrete plea agreement reached with the state).  Such

---

[16] To overturn a guilty plea on the basis of ineffective assistance of counsel, a habeas petitioner must establish that he was induced to plead guilty because of serious misinformation by counsel, such as gross misinformation concerning parole eligibility, *see Hill v. Lockhart*, 894 F.2d 1009, 1010 (8th Cir. 1990) (en banc); *Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir. 1988), *abrogated in part by Padilla v. Kentucky*, 130 S. Ct. 1473, 1484 (2010) (standard for evaluating counsel's advice not limited to affirmative misadvice, as in *Sparks*, but may also include acts of omission); *but see Hale v. Lockhart*, 903 F.2d 545, 549 (8th Cir. 1990) (rejecting claim that guilty plea was induced by incorrect information from counsel regarding parole eligibility where state court's finding that principal reason counsel advised petitioner to plead guilty was to avoid a potential death penalty, a finding supported by the record); *Pashos v. Moore*, No. 4:04 CV 428 DDN, 2005 WL 3348935, at *4-5 (E.D. Mo. Dec. 5, 2005) (denying habeas relief where, even if a contrary finding were reasonable, substantial evidence supported state court findings that pleas were voluntary and not induced by allegedly incorrect sentencing information from counsel).

conclusion, however, may not merit awarding Ross the relief he seeks.  As recently stated by the

Supreme Court:

> Asking whether the state court's application of *Strickland* was unreasonable is
> different from asking whether defense counsel's performance fell below that
> standard.  Under AEDPA, a state court must be granted a deference and latitude
> that are not in operation in a case involving direct review under *Strickland*.  A
> state court's determination that a claim lacks merit precludes federal habeas relief
> so long as "fair-minded jurists could disagree" on the correctness of that decision.

*See Richter*, 131 S. Ct. at 785-87 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).[17]

Finally, the issue arises whether Ross meets the second prong under *Strickland* and *Hill*.

The postconviction record is replete with Ross's statements that but for counsel's deception, he

would not have pleaded guilty and would have insisted on going to trial.  Counsel testified at the

post-conviction hearing that proceeding to trial was not a viable option given the overwhelming

evidence against his client.  *Id.*, Exhibit 12 at 11.  Counsel's opinion was that the entry of a

guilty plea was the best option given the substantial evidence against Ross, previous findings of

mental competency,[18] and the strong possibility of multiple life sentences had Ross proceeded to

trial.[19]  But it is not counsel's opinion that controls; it was Ross's decision to make, being fully

informed of the circumstances, and here, counsel has candidly admitted he intentionally misled

Ross out of an apparently paternalistic desire to get Ross to make the choice counsel believed he

should make.  Counsel clearly defaulted on his fundamental duty to provide effective assistance

of counsel.  Under these circumstances, the Court desires a full discussion by appointed counsel

---

[17] Even a strong case for relief does not mean the state court's contrary conclusions are unreasonable.  *Richter*, 541 U.S. at 786 (citing *Lockyer v. Andrade*, 538 U.S. 63 (2003)).

[18] Previous counsel had filed a suggestion of incompetency in this case as well as in another pending case, and evaluation by the Department of Mental Health and Hygiene revealed Ross was competent to stand trial.  ECF No. 9, Exhibit 2 at 2-4.

[19] The actual sentence imposed, 70 years, is less severe than multiple life sentences as Ross may earn credits toward mandatory release, an opportunity not available to those serving multiple life sentences.

of the application of governing § 2254 standards to the facts of this case.  Any discussion of the

second issue arguably implicates the third issue, the voluntary and knowing nature of the plea.

The parameters of the brief to be filed by appointed counsel are as set forth at the

beginning of this opinion:

1. Ineffective assistance of counsel during plea negotiations (but only regarding the issue of counsel's materially misleading his client about the state's attorney's expectation as to the likely sentence and its execution) and whether that prejudiced Ross; no other issue on ineffectiveness shall be briefed as the Court finds only this one contention to be viable.

2. Involuntariness of the plea due to Ross's reliance upon his counsel's misleading advice.

**Conclusion**

The petition for the writ of habeas corpus will be denied as to the issue of breach of the

plea agreement.  A separate order will issue in accord with this opinion.

DATED this 1st  day of June, 2012.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge